UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X
                                            :

RAFAEL DEJESUS PICHARDO,              :

                                            :

                           Plaintiff,    :        14 Civ. 7213 (KPF)

                                            :

                        v.             :        <u>OPINION AND ORDER</u>

                                          :

COMMISSIONER OF SOCIAL SECURITY,  :

                                            :

                           Defendant.  :

                                            :

------------------------------------------------------X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: <u>October 30, 2015</u>

KATHERINE POLK FAILLA, District Judge:

       Plaintiff Rafael Dejesus Pichardo, proceeding *pro se*, filed this action

pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C.

§ 405(g), claiming that the Acting Commissioner of Social Security (the

"Commissioner") erred when she determined that Plaintiff was not disabled

and, as a result, was not entitled to disability benefits. The Commissioner has

moved, unopposed, for judgment on the pleadings. The Court has reviewed the

administrative record and concludes that substantial evidence supports the

Commissioner's disability determination. For this reason, the Commissioner's

motion is granted.

## BACKGROUND[1]

### A.    Factual Background

Plaintiff was born in 1967, and he attended school through the eleventh grade. (SSA Rec. 36, 102). He was employed as a security guard from 1996 until 2003, when he accepted a job as a maintenance worker. (*Id.* at 103, 109, 139). On June 1, 2011, Plaintiff injured his right shoulder while he was removing a cabinet from the wall. (*Id.* at 148, 163). The following day, he sought treatment at the emergency room of what is now known as New York-Presbyterian/Lower Manhattan Hospital. (*Id.* at 148).

### 1.    Medical Evidence

On June 2, 2011, emergency room doctors diagnosed Plaintiff with a right shoulder sprain and sent him home with a sling. (SSA Rec. 148). One week later, Plaintiff was evaluated by Dr. Aric Hausknecht, a neurologist. (*Id.* at 148-50). Dr. Hausknecht noted that Plaintiff suffered from "winging of the right scapula" (i.e., an abnormal protrusion of the shoulder blade) and diagnosed him with "[r]ight long thoracic neuropathy with associated pain." (*Id.* at 149-50). As a result, Dr. Hausknecht concluded that Plaintiff had "a temporary total disability from his prior occupation as a maintenance worker." (*Id.* at 150). Dr. Hausknecht prescribed Naproxen for Plaintiff's pain and referred him to an orthopedic specialist. (*Id.*).

---

[1]    The facts contained in this Opinion are drawn from the Social Security Administrative Record ("SSA Rec.") (Dkt. #15), which was filed by the Commissioner as part of her Answer.

On June 18, 2011, Plaintiff received a magnetic resonance imaging ("MRI") scan of his injured shoulder.  (SSA Rec. 221-22).  The scan showed several shoulder injuries, including: (i) a "[f]ull-thickness supraspinatus tendon tear; (ii) a "[s]uperior labral (SLAP) tear"; and (iii) a "[d]iffuse anterior-inferior labral tear."  The scan also showed some "[m]ild" arthritis in Plaintiff's shoulder joint.  (*Id.*).

On June 27, 2011, Dr. Daniel Caligiuri evaluated the lower half of Plaintiff's right arm.  (*See* SSA Rec. 191-92).  Plaintiff told Dr. Caligiuri that his shoulder injury was accompanied by "persistent right hand and wrist pain associated with stiffness."  (*Id.*).  Dr. Caligiuri found "no evidence of any swelling, ecchymosis [i.e., discoloration], or deformity" in Plaintiff's right hand or wrist.  (*Id.*).  However, Dr. Caligiuri did find, "[w]ith respect to the right wrist and all of the digits of the right hand, there [was] good, but not full, active range of motion."  (*Id.*).  Dr. Caligiuri asked Plaintiff to attend physical therapy three times per week and encouraged him to "use his right wrist and hand as tolerated."  (*Id.* at 192).  At the same time, Dr. Caligiuri directed Plaintiff "to avoid any heavy lifting, strenuous activity, or sports."  (*Id.*).

Over the next few months, Plaintiff had several follow-up appointments with Dr. Hausknecht and his staff.  (*See* SSA Rec. 144-47).  Plaintiff also saw Dr. Steven Touliopoulos, an orthopedic surgeon, on two separate occasions.  (*Id.* at 213-15).  During Plaintiff's second visit on November 1, 2011, Dr. Touliopoulos recommended shoulder surgery.  (*Id.* at 215).  In the

meantime, Dr. Touliopoulos noted, Plaintiff was "totally disabled from his employment." (*Id.*).

Between September 28, 2011, and November 9, 2011, Plaintiff saw two doctors who assessed his eligibility for workers' compensation. (SSA Rec. 159-67). Dr. Jeffrey Passick performed the first assessment, during which he found that Plaintiff had a "moderate orthopedic disability" and was "not capable of returning to regular work." (*Id.* at 167). Nevertheless, Dr. Passick concluded, Plaintiff could "return to work with the following restrictions: No lifting with the right arm." (*Id.*). Dr. Passick recommended surgery to repair Plaintiff's right rotator cuff. (*Id.* at 166).

Dr. Mark Pitman performed the second assessment for purposes of workers' compensation. (SSA Rec. 159-62). Dr. Pitman determined that Plaintiff had "a marked partial disability" and "right shoulder surgery as requested by Dr. Touliopoulos is indicated and should be authorized." (*Id.* at 161). "Pending surgery," Dr. Pitman suggested, "[Plaintiff] would be capable of performing light duty work without the use of his dominant right upper extremity." (*Id.*).

On November 28, 2011, Dr. Touliopoulos and Dr. Charles DeMarco performed rotator cuff surgery on Plaintiff. (SSA Rec. 217). More specifically, they performed a "[r]ight shoulder arthroscopic repair of [Plaintiff's] SLAP lesion, [an] arthroscopic anterior and posterior capsulorrhaphy via capsule plication, arthroscopic subacromial decompression, and arthroscopic extensive

debridement with debridement of [the] partial undersurface of [Plaintiff's] rotator cuff tear and debridement of anterior labral fraying."  (*Id.*).

Between December 2, 2011, and January 20, 2012, Plaintiff had three post-surgical appointments with Dr. DeMarco, who checked on his surgical wounds.  (SSA Rec. 211-12, 216).  At the last of these appointments, Dr. DeMarco recommended a course of physical therapy.  (*Id.* at 211).

On January 26, 2012, Dr. Irene Chow performed a consultative examination for the Social Security Administration's Division of Disability Determinations.  (SSA Rec. 199-202).  Dr. Chow found that Plaintiff had "moderate limitations to heavy lifting and carrying with the right upper extremity" and "marked limitation with reaching overhead with the right shoulder."  (*Id.* at 202).

On February 16, 2012, Plaintiff had a post-surgical appointment with his neurologist, Dr. Hausknecht.  (SSA Rec. 232-33).  Plaintiff told Dr. Hausknecht that he had "lost some grip strength in the hand" and had "noticed some loss of sensation and tingling in the palm of his right hand.  At times he ha[d] pain that sho[t] up the arm and this [could] be triggered by contact."  (*Id.* at 232).  Dr. Hausknecht's physical exam revealed "antalgic weakness of the right shoulder," "right shoulder atrophy," "winging of the right scapula[]," "grossly intact" reflexes and sensations, "pain and crepitus in the right shoulder joint with guarding against movement,"  (*Id.*).  Dr. Hausknecht also observed that Plaintiff's right hand was "somewhat cool to the touch and dark in

appearance." (*Id.*).  Ultimately, Dr. Hausknecht concluded that Plaintiff was "totally disabled" and advised Plaintiff to restrict his activities.  (*Id.* at 233).

Between February 21, 2012, and August 17, 2012, Plaintiff had five more follow-up examinations with Drs. Touliopoulos and DeMarco.  (SSA Rec. 209-10, 226-28).  At Plaintiff's February 21 appointment, Dr. Touliopoulos noted that Plaintiff's "[i]mpingement signs [were] diminished," and that his rotator cuff strength was "mildly improved." (*Id.* at 210).  He also observed that Plaintiff's shoulder had "forward flexion to 90 degrees, [and] abduction to 90 degrees." (*Id.* at 210).  By August, Dr. DeMarco noted that Plaintiff's forward flexion had increased to 130 degrees and his abduction had increased to 110 degrees.  (*Id.* at 226).  In July and August of 2012, Drs. Touliopoulos and DeMarco both reported that Plaintiff was "progressing well, but slowly" following his surgery and recommended additional physical therapy.  (*Id.* at 226-27).  Despite Plaintiff's progress, Dr. Touliopoulos opined that Plaintiff was "totally disabled from his employment as a maintenance worker" and "totally disabled with respect to injury sustained to his right shoulder." (*Id.* at 227).  Similarly, Dr. DeMarco concluded that Plaintiff "remain[ed] totally disabled from his work as a maintenance worker." (*Id.* at 226).

At his hearing before an ALJ on March 14, 2013, Plaintiff testified that he continues to take Motrin and Advil for pain, and takes prescription pain medicine once every two weeks.  (SSA Rec. 24, 31-32).

6

### 2.    Non-Medical Evidence

#### a.    Prior Work Experience

As noted, Plaintiff was employed as a maintenance worker from 2003 until 2011.  (SSA Rec. 103, 109, 139).  He also worked as a security guard from 1996 to 2003.  (*Id.* at 103, 109).  Plaintiff consistently described his maintenance job as one that involved heavy lifting.  (*See, e.g.*, *id.* at 28-29, 159).  There were, however, a few variations in the way he described his work as a security guard.  In an interview with a Social Security disability examiner in February 2012, Plaintiff stated that his work as a security guard involved standing for six to eight hours and sitting for one hour each day.  (*Id.* at 124).  According to the examiner, Plaintiff also said "he just stood around" and "there was no lifting in this job."  (*Id.*).  By contrast, Plaintiff told the ALJ in March 2013, after the initial denial of his request for disability benefits, that his past guard work in fact involved some lifting, when "they used to bring me packages and all that stuff, like, UPS and all that."  (*Id.* at 30).  Plaintiff also told the ALJ that he would have to lift his walkie-talkie, and that the walkie-talkies at his last job were "not the small ones.  They're really big ones."  (*Id.*).  Finally, Plaintiff told the ALJ that he would have to "go[] up stairs, like, the 21st floor, check the stairs, [and] check the hallways."  (*Id.* at 31).

#### b.    Daily Activities

Plaintiff lives in an apartment with his family.  (SSA Rec. 117).  He is able to bathe and dress himself, but has trouble putting on shirts and coats with one arm, and he cannot shave or do his hair very well.  (*Id.* at 118-19).  He

7

prepares "canned food" and "small things" to eat, but he cannot cook "big meals," so his family cooks for him.  (*Id.* at 119-20).  Plaintiff says that he wipes down the counters and tables in his apartment, but does not perform any other chores.  (*Id.* at 120).  He told the ALJ that he spends his days "[j]ust staying home, checking my mom.  My mom is in the hospital so that — I really take care of [my parents]."  (*Id.* at 33).  When the ALJ asked what he did to care for his parents, Plaintiff clarified "Not — take care of them, I mean, like, watching them, like, to see how they're doing."  (*Id.*).  Plaintiff also spends time talking with family members, watching television, going to physical therapy, going to the doctor, and shopping for bread, milk, and canned food.  (*Id.* at 34, 118-22).  He leaves the house every other day, and either walks or takes public transportation when he does his errands.  (*Id.* at 120).

## B.    Procedural Background

On December 29, 2011, Plaintiff applied for Supplemental Security Income ("SSI") benefits.  (SSA Rec. 36, 83).[2]  After his application was denied on February 16, 2012, Plaintiff requested a hearing before an ALJ.  (*Id.* at 37-38).  Plaintiff appeared before ALJ Gitel Reich on March 14, 2013, and waived his right to counsel.  (*Id.* at 24-26).  He then proceeded to answer ALJ Reich's questions about his work history and his injured shoulder.  (*Id.* at 26-35).

---

[2]    There is some confusion in the record as to whether Plaintiff also applied for Social Security Disability Insurance ("SSDI") benefits.  (*See* SSA Rec. 83 (noting that Plaintiff applied for "Supplemental Security Income . . . [and] for benefits under the other programs administered by the Social Security Administration").)  However, the Court need not resolve this confusion, because the Social Security Administration uses a single test to determine whether an individual is sufficiently disabled to receive SSI and SSDI benefits.  *Compare* 42 U.S.C. § 1382c(a)(3)(A), *with* 42 U.S.C. § 423(d)(1)(A).

On April 11, 2013, ALJ Reich issued a decision concluding that Plaintiff was not disabled under Sections 216(i) and 223(d) of the Act, and as a result, he was not entitled to disability benefits.  (SSA Rec. 8-15).  The decision followed the familiar five-step framework for determining whether an individual is disabled under the Act.  (*Id.* at 8 (citing 20 C.F.R. § 404.1520(a))).  First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since he was injured on June 1, 2011.  (*Id.* at 10).  Second, the ALJ determined that Plaintiff had "the following severe impairments: status post rotator cuff tear and SLAP lesion of the right shoulder, [and] status post right shoulder arthroscopy."  (*Id.*).  At the third step of the analysis, the ALJ concluded that Plaintiff did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR [§§] 404.1520(d), 404.1525, 404.1526)."  (*Id.*).  The only listed impairment that could be relevant here was impairment 1.02, but the ALJ did not think Plaintiff's shoulder injury qualified as a "major dysfunction of a joint[]" characterized by "gross anatomical deformity . . . resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c."  (*Id.* at 10-11).  As a result, the ALJ moved on to step four of the analysis.

At step four, the ALJ found that, despite his injuries, Plaintiff had "the residual functional capacity to perform light work as defined in 20 CFR [§] 404.1567(b) except he can lift 5 pounds with his right hand, 10 pounds frequently with his left hand, and 20 pounds occasionally with the left hand,

and he can occasionally reach overhead with the right upper extremity." (SSA Rec. 11).  The ALJ reached this conclusion by considering whether Plaintiff's shoulder injury "could reasonably be expected to cause [his] alleged symptoms." (*Id.* at 12).  Ultimately, the ALJ concluded that Plaintiff's injury could cause the symptoms he described, but his "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely credible." (*Id.*).  The ALJ noted that Plaintiff "reported overall improvement in pain following surgery and testified to only taking pain medications every two weeks and managing his symptoms with physical therapy and home exercises." (*Id.* at 14).  Furthermore, Plaintiff "testified to being largely independent in activities of daily living and being able to help in the care of his parents." (*Id.*).

In addition, the ALJ explained, Plaintiff's medical records supported the conclusion that he was overstating the severity of his symptoms. (SSA Rec. 12-14).  The ALJ gave "considerable weight" to the conclusions of Drs. Touliopoulos and DeMarco that Plaintiff was disabled from heavy maintenance work. (*Id.* at 14).  At the same time, however, the ALJ gave "great weight" to "the opinions of Drs. Pitman and Passick in finding that claimant could perform light work with limited use of the right upper extremity, as such opinions are consistent with the overall record and with claimant's improvement following his surgery." (*Id.*).  The ALJ assigned "[o]nly some weight" to Dr. Hausknecht's opinion that Plaintiff was "totally disabled," finding that "[s]uch opinion is reserved to the Commissioner and such a broad conclusion is overly restrictive in light of [Plaintiff's] improved functionality

10

following his surgery." (*Id.*).  "Similarly, only some weight [was] assigned to the

opinions of Dr. Chow as her opinions [were] overly restrictive considering the

entire treating file and such examination only occurred on one occasion just

two months after surgery." (*Id.*).  In light of all the medical evidence, the ALJ

concluded, Plaintiff had the residual functional capacity (or "RFC") to perform

light work as long as he limited the amount he lifted with his right hand and

the number of times he reached overhead with his right arm.  (*Id.*).

Finally, the ALJ determined that Plaintiff was "capable of performing past

relevant work as a security guard." (SSA Rec. 14).  "In comparing [Plaintiff's]

residual functional capacity with the physical and mental demands of this

work," the ALJ found "that [Plaintiff] is able to perform it as actually and

generally performed." (*Id.*).  The ALJ explained:

> [Plaintiff] described his work as a security guard as
> standing for 6 to 8 hours per day, sitting for one hour
> per day, and not doing any lifting (Exhibit 5E).  He
> testified that his work required him to sometimes pick
> things up, without more detail.  More weight is given to
> [Plaintiff's] initial description of his work activity as it
> was provided before his initial denial.  Such description
> is also consistent with the DOT 372.667-038[.]
> Accordingly, [Plaintiff's] residual functional capacity
> allows him to return to his past relevant work as a
> security guard.

(*Id.* at 15).

Because the ALJ found that Plaintiff could obtain a job as a security

guard, there was no need for her to move on to step five of the disability

analysis, which requires an ALJ to consider whether an applicant is capable of

performing a job that he or she has not performed in the past.  *Selian* v. *Astrue*, 708 F.3d 409, 418 (2d Cir. 2013).

Plaintiff requested that the Appeals Council review ALJ Reich's decision, but the Appeals Council declined his request on July 9, 2014.  (SSA Rec. 2-4, 19-21).  This action followed.  On April 24, 2015, the Commissioner filed this motion for judgment on the pleadings.  (Dkt. #16).  Plaintiff declined to file a response.

## DISCUSSION

**A.    Applicable Law**

### 1.    Motions for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  In deciding a motion for judgment on the pleadings, courts apply the standard used to evaluate a motion to dismiss under Rule 12(b)(6).  *Altman* v. *J.C. Christensen & Associates, Inc.*, 786 F.3d 191, 193 (2d Cir. 2015); *Johnson* v. *Rowley*, 569 F.3d 40, 43 (2d Cir. 2009).  Under this standard, courts must "accept as true the facts alleged in the complaint, consider those facts in the light most favorable to the plaintiff, and determine whether the complaint sets forth a plausible basis for relief."  *Galper* v. *JP Morgan Chase Bank, N.A.*, — F.3d —, No. 14-cv-0867, 2015 WL 5711882, at *3 (2d Cir. Sept. 30, 2015); *see Ashcroft* v. *Iqbal*, 556 U.S. 662, 678-80 (2009).

### 2.   Determinations by the Commissioner of Social Security

In order to qualify for disability benefits, a claimant must demonstrate that he or she is disabled under the Social Security Act.  A claimant is disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); *accord* 42 U.S.C. § 423(d)(1)(A); *see also Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).  The alleged impairment must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 1382c(a)(3)(D); *accord* 42 U.S.C. § 423(d)(3), and it must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy," 42 U.S.C. § 1382c(a)(3)(B); *accord* 42 U.S.C. § 423(d)(2)(A).

If a claimant's application for SSI benefits is denied, the claimant may request a hearing before an ALJ.  Notably, "social security hearings are not (or at least are not meant to be) adversarial in nature."  *Lamay* v. *Comm'r of Soc. Sec.*, 562 F.3d 503, 508 (2d Cir. 2009).  As a result, presiding ALJs have an affirmative obligation to develop the administrative record.  *See id.* at 508-09.

Once ALJs have collected the necessary evidence, they follow a five-step process to decide whether a claimant is disabled:

> First, the [ALJ] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [ALJ] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [ALJ] will consider him [*per se*] disabled. . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [ALJ] then determines whether there is other work which the claimant could perform.

*Talavera* v. *Astrue*, 697 F.3d 145, 151 (2d Cir. 2012); *accord Selian*, 708 F.3d at 417-18.  "The claimant bears the burden of proving his or her case at steps one through four," while the Commissioner bears the burden at the final step. *Butts*, 388 F.3d at 383.

If a claimant disagrees with an ALJ's decision to deny benefits, the claimant may petition the Appeals Counsel for review.  *See Perez* v. *Chater*, 77 F.3d 41, 44 (2d Cir. 1996).  If the Appeals Counsel declines to review the case, the ALJ's decision becomes the Commissioner's final decision, which can be challenged in a district court.  *See id.*; 42 U.S.C. § 405(g).

"In reviewing a final decision of the [Commissioner], this Court is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian*, 708 F.3d at 417 (quoting *Talavera*, 697 F.3d at 145).  "'Substantial evidence'" is "'more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'" *Talavera*, 697 F.3d at 151 (quoting *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971)).  The Second Circuit has described the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." *Brault* v. *Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted).  "The substantial evidence standard means once an ALJ finds facts, [a reviewing court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Id.* (citations and internal quotation marks omitted, emphasis in original).

## B.   Analysis

### 1.   Plaintiff's Failure to Respond to Defendant's Rule 12(c) Motion Does Not Constitute Abandonment or Default

At the outset, it is important to note that "a failure to respond to a 12(c) motion cannot constitute a 'default' justifying dismissal of the complaint." *Maggette* v. *Dalsheim*, 709 F.2d 800, 802 (2d Cir. 1983); *accord Goldberg* v. *Danaher*, 599 F.3d 181, 183 (2d Cir. 2010); *Orr* v. *Comm'r of Soc. Sec.*, No. 13-cv-3967, 2014 WL 4291829, at *4 (S.D.N.Y. Aug. 26, 2014).  Rather, the Court must examine all the pleadings and decide as a matter of law whether Plaintiff has stated a plausible claim for relief.  *See Maggette*, 709 F.2d at 802. Furthermore, while "Plaintiff has not filed his own motion for judgment on the pleadings, his failure to do so does not prevent the Court from remanding this matter to the Commissioner if the record shows that remand is warranted." *Orr*, 2014 WL 4291829, at *4.

### 2.    The ALJ Adequately Developed the Record

As the Second Circuit has explained, before an ALJ's opinion can be assessed for support by substantial evidence in the record, a reviewing court must, as a threshold matter, "satisfy [itself] that the claimant has had 'a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act.'" *Echevarria* v. *Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (quoting *Gold* v. *Sec'y of Health, Ed. & Welfare*, 463 F.2d 38, 43 (2d Cir.1972)) (internal citations omitted).

Here, the ALJ took pains to ensure a complete record.  At the start of the hearing, she discussed with Plaintiff the possibility of obtaining counsel, and offered to adjourn the proceedings in order to permit Plaintiff to obtain new counsel.  (SSA Rec. 24-26; *see also id.* at 42-46 (written advice to Plaintiff of right to representation at the ALJ hearing)).  Nothing in the transcript of the hearing suggests that Plaintiff was incapable of evaluating the ALJ's offer; to the contrary, Plaintiff appears quite lucid in the transcript.  Upon securing Plaintiff's waiver, the ALJ discussed with Plaintiff his proffered disabilities, and obtained information regarding his medical and employment histories.  (*See id.* at 27-35).  Finally, the ALJ obtained records from each of Plaintiff's treating and consultative medical professionals, and considered those records in her decision.  (*Id.* at 11-14).

### 3. The ALJ's Decision Was Supported by Substantial Evidence

#### a. Substantial Evidence Supports the ALJ's Conclusion Concerning Substantial Gainful Activity

Substantial evidence supports the ALJ's conclusion that Plaintiff has not engaged in substantial gainful activity since he injured his shoulder on June 1, 2011. (SSA Rec. 10). Substantial gainful activity is "significant physical or mental activit[y]" that is "usually done for pay or profit." 20 C.F.R. § 404.1572. Generally, this activity does not include "taking care of [oneself], household tasks, hobbies, therapy, school attendance, club activities, or social programs." (*Id.*). Here, Plaintiff testified that his last day of work was June 1, 2011 (SSA Rec. 28), and there is no evidence that he has engaged in substantial gainful activity since then.

#### b. Substantial Evidence Supports the ALJ's Conclusion Concerning the Severity of Plaintiff's Impairments

The record also contains substantial evidence to support the ALJ's conclusion that Plaintiff had "severe impairments" that lasted at least 12 months. (SSA Rec. 10). Under 20 C.F.R. § 404.1520, an impairment is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities." In this case, Dr. Touliopoulos reported that Plaintiff's shoulder injuries caused "difficulty lifting objects [of] significant weight," "difficulty with overhead activities," and "difficulty with repetitive activities." (*Id.* at 209, 227). In addition, several doctors reported that Plaintiff's injuries were so severe that he could not be expected to perform his job as a maintenance worker. (*See, e.g., id.* at 202, 226-27, 233). Finally, while the ALJ did not

17

specifically mention it, there is ample evidence that Plaintiff's impairments

"lasted . . . for a continuous period of not less than 12 months." 42 U.S.C.

§ 423(d)(1)(A). Between July 2011 and August 2012, doctors consistently

stated that Plaintiff could not perform a full range of work activities. (*See, e.g.*,

SSA Rec. 147, 161, 167, 191-92, 202, 215, 226-27, 233).

### c.  Substantial Evidence Supports the ALJ's Conclusion That Plaintiff Was Not *Per Se* Disabled

The ALJ correctly determined that Plaintiff "does not have an impairment

or combination of impairments that meets or medically equals the severity of

one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20

CFR [§§] 404.1520(d), 404.1525, 404.1526)." (SSA Rec. 10). As the ALJ

observed, Appendix 1 lists "[m]ajor dysfunction of a joint(s) . . . [w]ith . . .

[i]nvolvement of one major peripheral joint *in each upper extremity* (i.e.,

shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross

movements effectively, as defined in 1.00B2c." 20 C.F.R. Pt. 404, Subpt. P,

App. 1, § 1.02 (emphasis added). Section 1.00B2c defines an "inability to

perform fine and gross movements effectively" as "an extreme loss of function of

*both upper extremities*; i.e., an impairment(s) that interferes very seriously with

the individual's ability to independently initiate, sustain, or complete

activities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2c (emphasis added).

In this case, there is no indication that Plaintiff had an extreme loss of function

in *both* shoulders. To the contrary, he testified that he was capable of using

his left shoulder to lift a gallon of milk. (SSA Rec. 29). He also reported that he

can bathe and dress himself, prepare "canned food" and "small things" to eat,

18

and shop for items like bread, milk, and canned food.  (*Id.* at 23, 118-21).

Thus, Plaintiff's injuries are less severe than the joint injuries listed in

Appendix 1, and they do not qualify as *per se* disabilities.

### d. Any Errors Committed by the ALJ in Determining Plaintiff's Residual Functional Capacity Were Harmless

The ALJ committed two legal errors when she determined that Plaintiff

had the RFC to return to his job as a security guard.  *See, e.g.*, *Meadors* v.

*Astrue*, 370 F. App'x 179, 182 (2d Cir. 2010) (summary order) (noting that an

ALJ's legal error may grounds for reversal in a Social Security case); *Townley* v.

*Heckler,* 748 F.2d 109, 112 (2d Cir. 1984) (same).  First, the ALJ did not

discuss Dr. Touliopoulos's opinion that Plaintiff was "totally disabled with

respect to injury sustained to his right shoulder."  (SSA Rec. 227-28).  Second,

the ALJ did not discuss Plaintiff's allegation that climbing stairs caused his

shoulder to swell.  (*See id.* at 30-31).  Ultimately, however, both of these errors

were harmless.

### i. The Omission of Dr. Touliopoulos's Opinion That Plaintiff Was Completely Disabled Was Harmless

The SSA regulations provide that the medical opinions of a claimant's

treating physician deserve special deference.  20 C.F.R. § 404.1527(c)(2).

Thus, when a claimant's treating physician offers an opinion on the "nature

and severity" of the claimant's impairments, the physician's opinion is entitled

to "controlling weight," so long as it is "well-supported by medically acceptable

clinical and laboratory diagnostic techniques" and consistent with "the other

substantial evidence in [the] case record."  *Id.*  This rule recognizes that a

19

claimant's treating physician may be in the best position to "provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)," and may even be able to provide "a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Id.*

By contrast, a treating physician's opinion that a claimant is "'disabled' or 'unable to work'" is not entitled to controlling weight because the presence or absence of a disability is a legal question "reserved to the Commissioner." 20 C.F.R. § 404.1527(d); *accord Snell* v. *Apfel,* 177 F.3d 128, 133 (2d Cir. 1999); *Patterson* v. *Colvin*, 24 F. Supp. 3d 356, 374 (S.D.N.Y. 2014).  Notably, however, when an ALJ rejects a treating physician's opinion that a claimant is "disabled," the ALJ still has an obligation to explain why the physician's opinion is "not being credited."  *Snell*, 177 F.3d at 134; *see also* 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.").  An ALJ's "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician" can be reversible error, *Snell*, 177 F.3d at 133, at least in cases where the treating physician's opinion is "significantly more favorable to the claimant than the evidence [the Commissioner] considered," *Zabala* v. *Astrue*, 595 F.3d 402, 409 (2d Cir. 2010). That said, a reviewing court will not reverse an ALJ's decision for failure to discuss a treating physician's opinion if there is "no reasonable likelihood" that the opinion could have changed the ALJ's disability determination.  *Id.* at 410.

In this case, Dr. Touliopoulos, Plaintiff's treating orthopedic surgeon, opined on two separate occasions that Plaintiff was "totally disabled with respect to injury sustained to his right shoulder." (SSA Rec. 227-28). Nevertheless, the ALJ never mentioned this opinion. (*See id.* at 13-14 (focusing on Dr. Touliopoulos's narrower statement that Plaintiff was "totally disabled from his employment as a maintenance worker")). The Court must therefore decide whether there is a "reasonable likelihood" that Dr. Touliopoulos's opinion could have changed the ALJ's disability determination. *Zabala*, 595 F.3d at 410. It concludes that there is none.

Notably, there are two possible ways to interpret Dr. Touliopoulos's statement that Plaintiff was "totally disabled with respect to injury sustained to his right shoulder." (SSA Rec. 227-28). First, it could mean that Plaintiff was completely disabled because of an injury sustained to his right shoulder. Second, and more likely, Dr. Touliopoulos's statement could mean that Plaintiff was completely unable to use his injured right shoulder. Regardless of which interpretation the Court adopts, however, there is no reasonable likelihood that Dr. Touliopoulos's opinion could have changed the ALJ's decision.

If Dr. Touliopoulos intended to make the broad claim that Plaintiff was "totally disabled" *because of* his shoulder injuries, then he intended to make precisely the same claim as Dr. Hausknecht. On February 16, 2012, Dr. Hausknecht stated that Plaintiff was "totally disabled" and should "restrict his activities." (SSA Rec. 233). The ALJ expressly considered — and then rejected — Dr. Hausknecht's opinion, explaining: "Such opinion is reserved to

21

the Commissioner and such a broad conclusion is overly restrictive in light of claimant's improved functionality following his surgery." (*Id.* at 14).  There is no reason to believe that the ALJ would have responded differently to Dr. Touliopoulos's statements.  *Cf. Zabala*, 595 F.3d at 409-10 (finding "no reasonable likelihood" that a treating physician's report would have changed the ALJ's disability determination because the report was "largely identical" to one the ALJ had already considered).

Alternatively, if Dr. Touliopoulos intended to make the narrower claim that Plaintiff was completely unable to use his injured right shoulder, there is still a negligible chance that his opinion would have swayed the ALJ.  The ALJ considered Plaintiff's allegations "regarding the limited use of his right upper extremity" and decided that they were only "partially credible."  (SSA Rec 14). In making this decision, the ALJ relied on the results of physical examinations (including those performed by Dr. Touliopoulos), Plaintiff's "overall improvement in pain following surgery," Plaintiff's lack of medical treatment after August 2012, and Plaintiff's ability to be "largely independent in activities of daily living" and to "help in the care of his parents." (*Id.* at 13-14).  In light of this evidence, there is "no reasonable likelihood" that the ALJ would have accepted Dr. Touliopoulos's opinion that Plaintiff was completely unable to use his right shoulder.  *Zabala*, 595 F.3d at 410.

### ii.     The ALJ's Failure to Discuss Plaintiff's Statement That Stairs Caused His Shoulder to Swell Was Also Harmless

When an ALJ calculates a Plaintiff's RFC, she "'is required to consider *all* of the claimant's symptoms[.]'" *Melendez* v. *Astrue*, 630 F. Supp. 2d 308, 318 (S.D.N.Y. 2009) (quoting *McCarthy* v. *Astrue,* No. 07-cv-300, 2007 WL 4444976, at *8 (S.D.N.Y. Dec. 18, 2007) (emphasis added); *see also* 20 C.F.R. § 404.1529(a) ("In determining whether you are disabled, we consider all your symptoms[.]")  The ALJ is also required to "consider *all* of [a claimant's] statements about [his] symptoms . . . and . . . how the symptoms affect [the claimant's] activities of daily living and [his] ability to work."  20 C.F.R. § 404.1529(a) (emphasis added).

Here, Plaintiff claimed that his shoulder injuries caused multiple symptoms, including swelling.  (*See* SSA Rec. 30-31, 104).  He further claimed that the swelling "affect[ed] [his] activities of daily living and [his] ability to work."  20 C.F.R. § 404.1529(a).  At the hearing before the ALJ, Plaintiff testified that "stairs really will make me feel uncomfortable," because climbing stairs "usually just gives me a swelling."  (SSA Rec. 30-31).  He explained that stairs can trigger swelling "even going to the train station when I go to see my doctors."  (*Id.* at 31).  Finally, he testified that the swelling could interfere with his ability to return to his former job as a security guard because, as a security guard, he had to go "up stairs, like, the 21st floor, [to] check the stairs, check the hallways . . . ."  (*Id.*).

The ALJ's opinion does not mention Plaintiff's persistent shoulder swelling, or Plaintiff's assertion that the swelling could interfere with his ability to work.  (SSA Rec. 8-15).  Thus, there is a "reasonable basis" to question whether the ALJ fulfilled her legal obligation to consider all of Plaintiff's symptoms and the limiting effects of those symptoms.  *Johnson* v. *Bowen*, 817 F.2d 983, 986 (2d Cir. 1987); *cf. Schaal* v. *Apfel*, 134 F.3d 496, 504 (2d Cir. 1998) (finding a "reasonable basis" to doubt that the ALJ followed a regulation because the ALJ did not explicitly consider "all of the factors cited" in that regulation).

 "Where there is a reasonable basis for doubt whether [an] ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."  *Johnson*, 817 F.2d at 986.  Precisely for this reason, the Court may not affirm the ALJ's disability determination unless there is "no reasonable likelihood" that the ALJ's legal error affected her disability determination.  *Zabala*, 595 F.3d at 409-10; *see also Johnson*, 817 F.2d at 986.

Here, there is no reasonable likelihood that the ALJ's legal error affected the outcome of Plaintiff's case.  If the ALJ had considered and *credited* Plaintiff's statement that climbing stairs cause his shoulder to swell, she likely would have added one caveat to her description of Plaintiff's RFC: Plaintiff could only climb stairs occasionally.  (*See* SSA Rec. 31 (acknowledging that

24

Plaintiff could occasionally climb the stairs at the train station)).  Thus, the key question is whether there is a reasonable likelihood that this caveat would have altered the ALJ's conclusion that Plaintiff had the RFC to return to work as a security guard.  The Court concludes that there is not.

When the ALJ considered the demands of Plaintiff's job as a security guard, she noted a discrepancy between the way Plaintiff had described the job to the Social Security disability examiner and the way he described it at his administrative hearing.  (SSA Rec. 15).  When he spoke to the disability examiner in February 2012, Plaintiff explained that, as a security guard, he had to stand for six to eight hours per day and sit for one hour.  He also said that there was "no lifting in this job." (*Id.* at 124).  By contrast, when he testified at his administrative hearing in March 2013, Plaintiff said that he was asked to lift "packages and all that stuff, like, UPS and all that." (*Id.* at 30).  After weighing these competing statements, the ALJ decided to give "more weight" to Plaintiff's "initial description of his work activity as it was provided before his initial denial [of benefits]." (*Id.* at 15).

Notably, there is a similar discrepancy between Plaintiff's statements to the Social Security disability examiner and Plaintiff's testimony that he was required to climb up to 21 flights of stairs when he was working as a security guard.  When Plaintiff spoke to the disability examiner, he said nothing about climbing stairs; rather, he said that, as a security guard, "he just stood around." (SSA Rec. 124).  At his administrative hearing, however, Plaintiff said that he had to "go[] up stairs, like, the 21st floor" to "check the stairs, check

the hallways." (*Id.* at 31). The Court has every reason to believe that, in resolving this second discrepancy, the ALJ would continue to give controlling weight to Plaintiff's statements to the disability examiner because those statements were made "before his initial denial [of benefits]" — i.e., before he had a motive to exaggerate the demands of his past work. (*Id.* at 15).

Consequently, even if the ALJ determined that Plaintiff had the RFC to climb stairs *occasionally* (but not routinely), there is no reasonable likelihood that she would have concluded Plaintiff was disabled. The ability to climb stairs occasionally would still allow Plaintiff to return to a job where he "just stood around." (SSA Rec. 124).

### iii. The ALJ's Determination That Plaintiff Had the Residual Functional Capacity to Work as a Security Guard Is Supported by Substantial Evidence

Because the Court concludes that the ALJ's legal errors were harmless, the Court can now consider whether the ALJ's RFC determination is supported by substantial evidence. *See Ellington* v. *Astrue*, 641 F. Supp. 2d 322, 327-28 (S.D.N.Y. 2009) (explaining that a court must consider any legal errors before deciding whether an ALJ's disability decision is supported by substantial evidence). The Court concludes that it is.

Substantial evidence supports the ALJ's determination that Plaintiff can "perform light work as defined in 20 CFR [§] 404.1567(b)," with some limitations. (SSA Rec. 11). Light work "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this

category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). In this case, the ALJ determined that Pichardo was capable of performing light work as long as he did not lift more than five pounds with his right hand, and only "occasionally" reached overhead with his right arm. (SSA Rec. 11).

Several pieces of evidence militate in favor of the ALJ's view. Plaintiff acknowledged that he is capable of lifting with his left arm, and he has no problems standing or walking. (SSA Rec. 29, 122-23). Plaintiff also reported that he was capable of shopping and running other errands on his own. (*See id.* at 118-21). Moreover, while Plaintiff's medical tests showed some limitations in his ability to use his right shoulder, the tests also showed that he had regained some strength and flexibility in his shoulder joint following surgery. (*See, e.g., id.* at 210, 226-27). For example, two months after surgery, Dr. Irene Chow measured the strength in Plaintiff's "right upper extremity" as a three out of five. (*Id.* at 201). Similarly, Dr. Touliopoulos conducted a physical examination six months after Plaintiff's surgery, which revealed "moderately diminished" — but not severely diminished — rotator cuff strength. (*Id.* at 228). Dr. Touliopoulos also measured improvements in Plaintiff's range of motion. (*Compare id.* at 210, *with id.* at 228). These test results suggest that Plaintiff was still capable of using his right shoulder in a limited way.

The record also contains ample evidence that Plaintiff's RFC allowed him to perform his past work as a security guard. As noted, Plaintiff told the Social

Security examiner that, as a security guard, he "just stood around." (*Id.* at 124). Plaintiff could easily "st[an]d around" without lifting more than five pounds with his right hand or reaching overhead with his right arm. Thus, substantial evidence supports the ALJ's determination that Plaintiff had the RFC necessary to return to work.

## CONCLUSION

For the foregoing reasons, the Defendant's motion for judgment on the pleadings is GRANTED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      October 30, 2015
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

*A copy of this Order was mailed by Chambers to:*

Rafael DeJesus Pichardo
157 Broome Street
Apt. 5D
New York, NY 10002